**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


UNITED STATES OF AMERICA,

                  Plaintiff/Appellee,

v.                                               No. CR 05-1516-MV

RAY WESTALL OPERATING, INC.,

                  Defendant/Appellant.


**<u>MEMORANDUM OPINION AND ORDER</u>**


       **THIS MATTER** comes before the Court on Defendant/Appellant Ray Westall Operating,

Inc.'s ("Westall") Notice of Appeal (Doc. No. 27, filed December 22, 2006). The Court, having

reviewed the record *de novo* and the Parties' submissions, and for the reasons given below,

**REVERSES** the judgment of the Magistrate Court.

**Procedural Background**

       The United States filed an information charging Westall with violating the Migratory Bird

Treaty Act ("MBTA"). (Doc. No. 1, filed July 19, 2005). After conducting a bench trial on January

9, 2006, United States Magistrate Judge Karen B. Molzen found Westall guilty of the Class A

misdemeanor as charged in the information. (Findings of Fact and Conclusions of Law at 17, Doc.

No. 19, filed March 31, 2006, "Findings and Conclusions"). Judge Molzen entered judgment on

December 15, 2006 (Doc. No. 25). Appellant then filed its appeal which is now before the Court.

**Issue on Appeal**

The Magistrate Judge found Defendant guilty of taking migratory birds in violation of the Migratory Bird Treaty Act.  (Findings and Conclusions at 17).  The Magistrate Judge concluded that the Migratory Bird Treaty Act imposes liability for unintended bird deaths resulting from indirect conduct if such conduct proximately caused the birds' deaths.  (*Id.* at 15).  The Magistrate then determined that the birds' deaths were foreseeable and avoidable with more frequent inspections. (*Id.* at 17).

The single issue on appeal is:

Whether the Migratory Bird Treaty Act (MBTA), which makes it "unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill . . . any migratory bird," criminalizes negligent acts or omissions that are not directed at birds, but which incidentally and proximately cause bird deaths.

(Doc. No. 30 at 2, filed April 25, 2007, "Opening Brief").

**Standard of Review**

"In all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the district court of the district in which the offense was committed."  18 U.S.C. § 3402.  "The defendant is not entitled to a trial de novo by a district judge.  The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." FED. R. CRIM. P. 58(g)(2)(D).  The Court of Appeals reviews a question of the construction and applicability of a federal statute *de novo*.  *United States v. Cisneros*, 328 F.3d 610, 613 (10th Cir. 2003);  *see also Grimsley v. Taylor*, 93 F.3d 676, 679 (10th Cir. 1996) ("we apply the clearly erroneous standard to the magistrate judge's findings of fact and review de novo questions of law and mixed questions of law and fact").

2

**Factual Background**

The Parties do not dispute Judge Molzen's Findings of Fact.  (Appellant's Opening Brief at 3, Doc. No. 30, filed April 25, 2007; United States' Response at 1, Doc. No. 31, filed June 8, 2007).

Westall had several evaporation pits at its oil production site in Artesia.  (Findings and Conclusions, ¶ 2 at 1).  Water produced during the oil extraction process is pumped into a holding tank and later reinjected into the ground at another location by means of a transfer pump with a high/low electrical shut-off switch.  (*Id.*, ¶ 3 at 1).  If the holding tank reaches maximum capacity, the overflow water discharges to the evaporation pit where it evaporates into the air or percolates into the ground.  (*Id.*, ¶ 4 at 2).  Oil in the pit will float on the water surface thereby posing a danger to birds, including some species protected by the MBTA.  (*Id.*, ¶ 5 at 2).

The pit at issue in this case was approximately seven yards wide and thirty-one yards long, was entirely covered by netting made out of chicken wire to prevent birds from exposure to the oil hazard, and was surrounded by a barbed wire fence to keep out livestock.  (*Id.*, ¶ 2 at 1, ¶¶ 6-7 at 2).  Pumper employees inspected the pits every four to six weeks; Federal Bureau of Land Management employees inspected the pits at approximately two month intervals; and New Mexico Oil Conservation Division employees inspected the pits annually.  (*Id.*, ¶¶ 9-10 at 2).  Westall did not receive any notice of noncompliance with regulations as to its pits over the sixteen years prior to the incident in question.  (*Id.*, ¶ 11 at 2).

Sometime in late July or early August 2002, the high/low switch malfunctioned, probably due to an electrical storm, and the overflow water began to accumulate in the evaporation pit.  (*Id.*, ¶ 12 at 2).  It would have taken about a week to ten days for the pit to completely fill with the overflow discharge.  (*Id.*, ¶ 13 at 3).  The water in the pit rose to such a level that in some areas the

3

oil "ponded" above the level of the sagging netting.  (*Id.*, ¶ 15 at 3).  Unbeknown to Westall, some

unknown person removed a six-foot wide section of the wire along the eastern edge of the pit,

probably the result of vandalism.  (*Id.*, ¶ 14 at 3).  There had been no prior incidents of vandalism

at Westall's pits.  (*Id.*, ¶ 21 at 3). On August 15, 2002, the carcasses of fifty dead birds were

discovered in the pit, some above the netting and some from under the netting, thirty-four of which

belonged to species protected by the MBTA.  (*Id.*, ¶¶ 16-18 at 3).

**Plain Language of the Migratory Bird Treaty Act**

With issues of statutory construction, the Court begins by examining the plain language of

the statute. *Robbins v. Chronister*, 402 F.3d 1047, 1049 (10th Cir. 2005); *United States v. Graham*,

305 F.3d 1094, 1102 (10th Cir. 2002) (When determining the plain meaning of a statute, the court

"must look to the particular statutory language at issue, as well as the language and design of the

statute as a whole.").

The MBTA provides that:

> Unless and except as permitted by regulations made as hereinafter provided in this
> subchapter, it shall be unlawful at any time, by any means or in any manner, to
> pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for
> sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment,
> ship, export, import, cause to be shipped, exported, or imported, deliver for
> transportation, transport or cause to be transported, carry or cause to be carried, or
> receive for shipment, transportation, carriage, or export, any migratory bird . . .
> included in the terms of the conventions between the United States and [Great Britain
> . . . Mexico . . . Japan . . . and the Soviet Union] . . . .

16 U.S.C. § 703.

The statutory language at issue is: "it shall be unlawful at any time, by any means or in any

manner, to . . . kill . . . any migratory bird."  Defendant argues that "kill" refers to "conduct directed

at birds, such as hunting and poaching, and not acts or omissions having merely the incidental effect

of causing bird deaths." (Opening Brief at 2). The United States argues that the MBTA applies "to acts or omissions that incidentally and proximately cause the deaths of migratory birds." (Response at 2).

Because the statute does not define the term "kill," the Court construes the term in accord with its ordinary meaning which is to deprive of life. *See United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002) (The court construes words that are not defined by statute in accord with their ordinary or natural meanings.). The statute modifies the term "kill" with the phrase "by any means or in any manner." The statute does not define the phrase "by any means or in any manner," which ordinarily means any way possible. The statute is silent as to whether it applies only to conduct directed at migratory birds or to all acts or omissions, including those that accidentally or incidentally cause the deaths of migratory birds. The statute is, therefore, open to more than one interpretation. *See Newton County Wildlife Assoc. v. United States Forest Service*, 113 F.3d 110, 115 (8th Cir. 1997) (describing the term "kill" in 16 U.S.C. § 703 as "ambiguous").

The Court's conclusion that the statute is ambiguous is supported by a split in the Circuit Courts. Two Circuits, the Eighth and the Ninth, concluded that the term "kill" in the MBTA means physical conduct of the sort engaged by hunters and poachers, while the Second Circuit held that a corporation that performed an affirmative act not related to hunting that caused the death of migratory birds could be held strictly liable under the MBTA. *See Newton County Wildlife Assoc. v. United States Forest Service*, 113 F.3d 110, 115 (8th Cir. 1997); *Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302 (9th Cir. 1991); *United States v. FMC Corp.*, 572 F.2d 902, 908 (2d Cir. 1978).

Having concluded that the statute is ambiguous, the Court must look to the legislative history and the underlying public policy of the statute to determine the intent of Congress. *United States*

5

*v. Manning*, 526 F.3d 611, 614 (10th Cir. 2008) (If the statutory language is clear, the court's analysis ends.).

**Legislative History and Public Policy of the MBTA**

Congress enacted the MBTA to give effect to the December 8, 1916 treaty between the United States and Great Britain. *Missouri v. Holland*, 252 U.S. 416, 431 (1920). The treaty between the United States and Great Britain "for the protection of migratory birds" arose from their "being desirous of saving from indiscriminate slaughter and of insuring the preservation of such migratory birds as are either useful to man or are harmless . . . ." 39 Stat. 1702. The United States and Great Britain agreed that "as an effective means of preserving migratory birds there shall be established . . . close seasons during which no hunting shall be done except for scientific or propagating purposes under permits issued by proper authorities." *Id.* at Art. II. While the treaty allows for limited hunting seasons for some migratory game birds, it provides for continuous close hunting seasons for other migratory game birds, migratory insectivorous birds, and migratory nongame birds. *Id.* at Art. II-IV. The treaty also prohibits the taking of nests or eggs of migratory birds, and the shipment or export of migratory birds and their eggs. *Id.* at Art. V-VI. The treaty authorizes permits to kill any of the migratory birds "which, under extraordinary conditions, may become seriously injurious to the agricultural or other interests in any particular community." *Id.* at Art. VII.

"The MBTA has since been amended to implement conventions which the United States has signed with Mexico, Japan, and the Soviet Union." *Alaska fish and Wildlife Federation and Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 940 (9th Cir. 1987).

The convention between the United States and Mexico seeks to "protect migratory birds . . . in order that the species may not be exterminated" by "employ[ing] adequate measures which will

permit a rational utilization of migratory birds for the purposes of sport as well as for food, commerce and industry." 50 Stat. 1311 (those measures include close seasons for the taking of migratory birds, their nests and eggs, establishment of refuge zones, limits on the length of hunting seasons, and the prohibition of killing migratory insectivorous birds except when they become injurious to agriculture and constitute plagues).

The convention between the United States and Japan prohibits the taking migratory birds or their eggs with limited exceptions. 1974 WL 166630. Those exceptions include (1) for scientific, educational, propagative or other purpose inconsistent with the treaty objectives, (2) for the purpose of protecting persons and property, (3) during open hunting seasons set to avoid nesting seasons and to maintain their populations in optimum numbers, (4) with respect to private game farms, and (5) taking by Eskimos, Indians and indigenous peoples for their own food and clothing. *Id.* at Art. III. The convention between the United States and the Soviet Union contains provisions similar to those in the United States/Japan convention prohibiting the taking of migratory birds with certain exceptions. 1978 WL 182150 at Art. II.

The general policy of the conventions is to protect and preserve migratory birds. The language in the conventions indicates that the primary method for insuring the preservation of migratory birds is to regulate conduct directed toward migratory birds, primarily hunting and the taking of nests and eggs. Each of the conventions expressly states the parties agree to establish close seasons when hunting is prohibited. There is no express language in the conventions suggesting that the United States and Great Britain, Mexico, Japan and the Soviet Union agreed to criminalize negligent acts or omissions that are not directed at migratory birds but which incidentally and proximately cause the deaths of migratory birds.

7

The United States argues that the "original legislative history shows an understanding that the prohibition was particularly sweeping" and that "opponents of the bill objected to it on the very grounds that its language was so sweeping and thus would prohibit absolutely any killing of a migratory bird, even inadvertent, unless and until the Secretary issued regulations permitting it." (Response at 6). The United States supports its argument with quotes from three Congressmen, one of whom "speculat[es] that under the MBTA as proposed a barefoot boy who throws a rock and 'inadvertently' strikes a robin's nest and breaks an egg would be hauled before a court for violation of a treaty between the United States and Canada." (Response at 6).

The United States cites *United States v. Moon Lake Electric Assoc., Inc.*, 45 F.Supp.2d 1070 (D.Colo. 1999) which recites the legislative history of the MBTA "relative to a contention that the statute was intended to address only physical conduct normallly exhibited by hunters or poachers." (Response at 6). The government had alleged that Moon Lake failed to install inexpensive equipment on its electric power poles causing the death of protected birds. *United States v. Moon Lake Electric Assoc., Inc.*, 45 F.Supp.2d at 1071. The *Moon Lake* court quotes statements from many legislators and concludes "there is no clearly expressed legislative intent that the MBTA regulates only physical conduct associated with hunting or poaching." *Id*. at 1080-1082. Only two of the quoted statements refer to inadvertent or accidental acts. *Id.* at 1081 (both anticipating application of the MBTA against a boy that accidently breaks a bird's egg). However, "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979). Furthermore, statements by other legislators show that the bill is aimed at the professional hunters and sportsmen. (*See* Opening Brief at 13).

The United States also cites *United States v. FMC Corp.*, 572 F.2d 902 (2d. Cir. 1978) to support application of the MBTA to acts or omissions that incidentally result in the death of a protected bird.  (Response at 14-15).  In *FMC Corp.*, the Second Circuit did not discuss the legislative history of the MBTA stating "[w]here there is no help to be had from legislative history or decisional authority, as in this specific situation, resort must be had to a rule of reason or even better, common sense." *United States v. FMC Corp.*, 572 F.2d at 905.  The Second Circuit then analogized the case "to the situations of various tort notions of strict liability." *Id.* at 907.  The Second Circuit held that FMC's engaging in an activity involving the manufacture of a highly toxic chemical and failing to prevent the chemical from escaping into a pond and killing birds was sufficient to impose strict liability on FMC.  *Id.* at 908.  The Second Circuit reasoned that:

> Certainly construction that would bring every killing within the statute, such as deaths caused by automobiles, airplanes, plate glass modern office buildings or picture windows in residential dwellings into which birds fly, would offend reason and common sense.  As stated in one of the early decisions under the Act, '(a)n innocent technical violation on the part of any defendant can be taken care of by the imposition of a small or nominal fine.'  United States v. Schultze, 28 F.Supp. 234, 236 (W.D.KY. 1939).  Such situations can be left to the sound discretion of prosecutors and the courts.

*United States v. FMC Corp.*, 572 F.2d at 905, 908 (concluding that "[i]mposing strict liability on FMC in this case [by analogizing to tort cases] does not dictate that every death of a bird will result in imposing strict criminal liability on some party."); *see also United States v. Moon Lake Electric Assoc., Inc.*, 45 F.Supp.2d at 1084 (*quoting FMC Corp.* for the proposition that construction of the MBTA to include bird deaths caused by automobiles, plate glass office buildings and residential picture windows into which birds fly, would offend reason and common sense).

The Court "will not rely on prosecutorial discretion to ensure that a statute does not ensnare those beyond its proper confines." *See United States v. Wells*, 519 U.S. 482 n.15 (1997) (Justice

Stevens, dissenting) (*quoting Baggett v. Bullitt*, 377 U.S. 360, 373-374 (1964) ("It will not do to say that a prosecutor's sense of fairness and the Constitution would prevent a successful . . . prosecution for some of the activities seemingly embraced within the sweeping statutory definitions" and "Well-intentioned prosecutors and judicial safeguards do not neutralize the vice of a vague law."); *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 599 (1967) ("It is no answer to say that the statute would not be applied in such a case."); *United States v. Moon Lake Electric Assoc., Inc.*, 45 F.Supp.2d at 1084 ("courts should not rely on prosecutorial discretion to ensure that a statute does not ensnare those  beyond its proper confines.").

The United States also argues that the Incidental Taking of Migratory Birds During Military Readiness Activities Amendment ("Incidental Military Take Amendment") affirms its interpretation that the MBTA prohibits the killing of birds by any means or by any manner.  (Response at 7-8).

Congress enacted the Incidental Military Taking Amendment in response to the decision in *Center for Biological Diversity v. Pirie*, 191 F.Supp.2d 161 (D.C. 2002), *vacated by Center for Biological Diversity v. England*, 2003 WL 179848 (D.C. Cir.) (appeal moot in light of Incidental Military Taking Amendment).  In *Pirie*, the court concluded that the military's use of live fire training exercises violated the MBTA.  *Id.* at 174 (defendants "engaged in activities that have the *direct* consequence of killing" migratory birds) (*emphasis added*).  The Incidental Military Taking Amendment temporarily provided that the MBTA does "not apply to the incidental taking of a migratory bird by a member of the Armed forces during a military readiness activity."  Public Law 107-314 Sec. 315(a), (d) (Dec. 2, 2002) (also ordered that the Secretary of Interior prescribe regulations to make the prohibition permanent).  Military readiness activity includes combat training and testing of weapons but does not include other military activities and the operation of industrial

10

activities. *Id.* Sec. 315(f).

The United States contends that because the Incidental Military Taking Amendment does not provide an exemption for operation of industrial activities, it affirms the prohibition against killing migratory birds by any means or by any manner, including the operation of industrial activities. (Response at 7). The Court disagrees. Shooting at and bombing locations where migratory birds are present are activities, similar to hunting, that have the direct consequence of killing birds. *See Center for Biological Diversity v. Pirie*, 191 F.Supp.2d 161 (D.C. 2002). The Court reads the Incidental Military Taking Amendment as permitting such direct takings under limited circumstances, i.e. combat training and weapons testing, but not permitting takings by other military conduct that may have the direct consequence of killing migratory birds. There is no language in the MBTA expressly extending the prohibition against killing migratory birds to acts or omissions that are not directed at migratory birds but which may indirectly kill migratory birds. The Court concludes that the MBTA only prohibits conduct directed at migratory birds.

Other Circuit and district courts have concluded that the plain language of the MBTA only prohibits conduct directed at migratory birds:

> Strict liability may be appropriate when dealing with hunters and poachers. But it would stretch this 1918 statute far beyond the bounds of reason to construe it as an absolute criminal prohibition on conduct, such as timber harvesting, that *indirectly* results in the death of migratory birds. Thus, we agree with the Ninth Circuit that the ambiguous terms "take" and "kill" in 16 U.S.C. § 703 mean "physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918."

*Newton County Wildlife Assoc. v. United States Forest Service*, 113 F.3d 110, 115 (8th Cir. 1997) (*emphasis in original*) (*quoting Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302 (9th Cir. 1991)); *see also United States v. Olson*, 41 F.Supp. 433, 434 (D.C. Ky. 1941) (fundamental purpose of

MBTA is to protect migratory birds from destruction in an unequal contest between the hunter and the bird); *Citizens Interested in Bull Run, Inc. v. Edrington*, 781 F.Supp. 1502, 1509 (D.C. Or. 1991) (same); *Mahler v. United States Forest Service*, 927 F.Supp. 1559, 1574 (S.D. Ind. 1996) ("The MBTA was designed to forestall hunting of migratory birds and the sale of their parts."); *United States v. Engler*, 806 F.2d 425, 431 (3d Cir. 1986) (*quoting* S. Rep. No. 1779, 86th Cong., 2d Sess. 1) (The 1960 amendment to the MBTA making the sale of protected species a felony "was intended to differentiate between 'an individual who hunts migratory birds for pleasure' and 'a person who slaughters these wildfowl for commercial purposes as a means of livelihood' and therefore to 'better protect our migratory game birds.'").

The Court finds that it is highly unlikely that Congress intended to impose criminal liability on every person that indirectly causes the death of a migratory bird.  The Court concludes that Congress intended to prohibit only conduct directed towards birds and did not intend to criminalize negligent acts or omissions that are not directed at birds, but which incidentally and proximately cause bird deaths.  *See Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) ("When statutory language reasonably admits of alternative constructions, there is nothing remarkable about resolving the textual ambiguity against the alternative meaning that produces a result the framers are highly unlikely to have intended.").

The Court **REVERSES** the judgment of the Magistrate Court.

**IT IS SO ORDERED.**

Dated this 25th day of February, 2009.

_____
MARTHA VÁZQUEZ
**CHIEF UNITED STATES DISTRICT JUDGE**

*Attorneys for Appellant*:

David A. Freedman
Theresa M. Duncan
P.O. Box 25326
Albuquerque, NM 87125


*Attorneys for Appellee*:

Mary Catherine McCulloch
Elinor Colbourn
P.O. Box 607
Albuquerque, NM 87103-607